UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 05-138 (WOB)

KENTUCKY SPEEDWAY, LLC                                                PLAINTIFF

VS.                                    **OPINION AND ORDER**

NATIONAL ASSOCIATION OF STOCK
CAR AUTO RACING, INC., a/k/a NASCAR
and
INTERNATIONAL SPEEDWAY CORPORATION                  DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  INTRODUCTION

This is an antitrust action by the owner of a local auto-racing track (Plaintiff Kentucky Speedway, LLC, hereinafter referred to as Speedway) against a promoter of stock car racing (Defendant National Association of Stock Car Racing, Inc., hereinafter referred to as NASCAR) and an affiliated corporation (Defendant International Speedway Corporation, hereinafter referred to as ISC).  ISC operates certain stock car race tracks across the United States.  NASCAR promotes ("sanctions") several series of stock car races: NEXTEL, Busch, the Craftsman Truck Series, as well as several local series.

This case concerns the sanctioning (licensing) of NASCAR'S NEXTEL series, which may be thought of as the World Series or Superbowl of stock car racing.  NEXTEL races are in high demand and are excellent revenue producers.  NASCAR sanctions 36 such races.  It offers 19 of these races to its affiliate, ISC, at its 12 tracks.  The remainder are sanctioned at other

tracks. But NASCAR refuses to allow Plaintiff Speedway to host a NEXTEL race.[1] (Doc. #225, Defs.' Mem. in Supp. of Summ. J. 10.) Although there are literally thousands of pages of briefs and exhibits that have been filed herein, this is all this case is essentially about. Speedway alleges violations of the Sherman Act § 1, 15 U.S.C. § 1 (conspiracy in restraint of trade), and § 2, 15 U.S.C. § 2 (attempt to monopolize). After an adequate period for discovery, Defendants filed a Joint Motion for Summary Judgment. (Doc. #225.) Responses and replies were duly filed. (Docs. #272 & #277.)

After careful consideration and a thorough review of the record, and granting Speedway the benefit of the doubt on all reasonable inferences therefrom, the court concludes that Speedway has failed to make out its case. Summary judgment on both claims is therefore appropriate.

## II. ANALYSIS

The above highly-truncated statement of facts is all that is necessary to understand this case, because it is essentially a "jilted distributor" case. As the following discussion illustrates, a producer of a product is free under current antitrust laws to select its distributors[2] and to refuse to deal with would-be distributors, no matter how worthy or deserving they may be. Even more fundamentally, in order to establish both its antitrust claims, Speedway was required to prove relevant markets through qualified expert testimony as part of its prima facie case. This it failed to do, after being given a sufficient opportunity. Thus, summary judgment is appropriate.

---

[1] The court will assume that Speedway is fully qualified to host such a race, as well as give Speedway the benefit of all factual inferences.

[2] In this context, the term "distributor" includes both wholesalers and retailers.

### A. *The Summary Judgment Standard*

Recently, the Sixth Circuit had occasion to discuss the standards for summary judgment in an antitrust case:

> The District Court construed the Supreme Court's trilogy of *Matsushita, Anderson,* and *Celotex* to have "in the aggregate, lowered the movant's burden in seeking summary judgment." (J.A. 44). We respectfully disagree. The Supreme Court observed that summary judgment is appropriate where the antitrust claim "simply makes no economic sense," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467, 112 S. Ct. 2072, 119 L.Ed.2d 265 (1992), or "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. . . ." *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)(citations omitted). The Supreme Court "has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'" *Eastman Kodak Co.*, 504 U.S. at 467, 112 S. Ct. 2072 (quoting *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 579, 45 S. Ct. 578, 69 L.Ed. 1093 (1925)). Moreover, as the Supreme Court explained, *Matsushita* does not increase the non-movant's burden on a motion for summary judgment. "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach a jury. . . ." *Kodak*, 504 U.S. at 468, 112 S. Ct. 2072.

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.,* 431 F.3d 917, 930-31 (6th Cir. 2005).

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* the Court elaborated on the factual showing that a plaintiff must make to survive summary judgment, emphasizing that "the issue of fact must be 'genuine.'" 475 U.S. 574, 586 (1986) (*citing* Fed. R. Civ. Proc. 56(c), (e)). The Court further observed that the party opposing a grant of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id*. at 587 (*citing First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S. Ct. 1575, 1592 (1968)).

-3-

*Matsushita* instructs that if the plaintiff's claims simply make "no economic sense," it must come forward with "more persuasive evidence." *Id.* As the Sixth Circuit observed in *Spirit Airlines,* "if the [plaintiff's] expert provides a reliable and reasonable opinion with factual support, summary judgment is inappropriate." *Spirit Airlines,* 431 F.3d at 931. As the discussion below illustrates, in this court's view there was a total failure of proof of any relevant market in this case and, thus, of any "reliable and reasonable opinion with factual support," because Plaintiff's expert opinions did not pass *Daubert* analysis. Without proof of relevant markets, Speedway's theories make no economic sense. Thus, summary judgment is appropriate. *Cf. Street v. J.C. Bradford Co.*, 886 F.2d 1472, 1476-81 (6th Cir. 1989) (reviewing the progression of Supreme Court decisions marking a return to the original purpose of summary judgments as an effective procedural device in federal court litigation, including complex cases).

### B. *Speedway's Expert Testimony Fails the Daubert Test*

An essential component of Speedway's theories is the definition of a relevant product market or markets. Speedway postulates two relevant markets: a sanctioning market for the NEXTEL race and a hosting market for the same race.

Speedway relies on the expert report and deposition testimony of Professor Andrew Zimbalist for evidence of the existence of these markets. Zimbalist's theories have been challenged by Defendants in *Daubert* motions.[3] (Docs. #219 & #256.)

In its decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), the Supreme Court of the United States placed significant restrictions on the use of a "hired gun"

---

[3]The court will assume for the purpose of this analysis that Zimbalist possesses adequate credentials. The opinions of plaintiff's other expert, Keith Leffler, are based on Zimbalist's market analysis.

-4-

expert. The previous standard had (at least in practice) roughly been: if the expert witness knows more about the subject than the jury, he or she should be permitted to testify. *Daubert* established a far-sweeping new approach.

The standards set by *Daubert* were later incorporated into Federal Rule of Evidence 702, which reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The trial court must act as a "gatekeeper" to ensure that unreliable expert testimony is excluded from evidence. *Daubert,* 509 U.S. at 592-94.

*Daubert* enumerated several factors which are relevant to assessing an expert's testimony:

> . . . . (1) whether a "theory or technique . . . can be (and has been) tested;" (2) whether the theory "has been subjected to peer review and publication;" (3) whether there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation;" and (4) whether the theory or technique enjoys "general acceptance" within the scientific community. *Daubert*, 509 U.S. at 592-94; *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 n.5 (6th Cir. 2001). The Sixth Circuit further examines an expert's opinion by reviewing its context: whether the opinion naturally and directly grows out of research previously conducted independently of the litigation in question, or whether the expert developed the opinion just for the purpose of testifying, which does not offer the same objective proof that the research comports with the dictates of good science. *See Mike's Train House v. Lionel, LLC*, 472 F.3d 398, 408 (6th Cir. 2006) ("We have been suspicious of methodologies created for the purpose of litigation"); *Nelson*, 243 F.3d at 252 (magistrate justified in considering fact that expert's study was conducted and opinions were formed merely for purposes of litigation); *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1352 (6th Cir. 1992) ("expert witnesses are not necessarily always unbiased scientists" because "they are paid by one side for their testimony"); *see also Early*

>*v. Toyota Motor Corp.*, 486 F. Supp. 2d 633, 637 n.2 (E.D. Ky. 2007); *Johnson v. Manitowac Boom Trucks, Inc.*, 406 F. Supp. 2d 852, 860 (M.D. Tenn. 2005); *aff'd*, 484 F.3d 426, 434 (6th Cir. 2007). Plaintiff bears the burden of proof as to the admissibility of the opinions of any experts it offers. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999).

(Doc. #219, Defs.' Jt. Mot. for Order to Limit the Expert Test. of Andrew Zimbalist with Attached Mem. in Supp. 5, 6.)

Definition of the relevant market(s) in this kind of case must be accomplished by expert testimony which meets the *Daubert/*Rule 702 criteria. It is obvious that Zimbalist's analysis fails this test. The critical factor for the analysis is "cross-elasticity of demand" between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962).

All parties agree that the Justice Department's "merger guidelines test" is an accepted means of analyzing the interchangeability of a product and its substitutes. *See Nilavar v. Mercy Health Sys.-Western Ohio,* 244 Fed. Appx. 690, 698 (6th Cir. 2007) (unpublished decision) (discussing the merger guidelines test). This test assesses whether the producer or seller of the product can raise its prices by a small amount (typically 5% is used) and still make money. That is: if such a price rise were implemented, would the consumers go elsewhere?

Zimbalist did not apply this test, but rather used his own version of it for this litigation. *See* Zimbalist Report, pp. 4, 9 ff. Zimbalist's approach, however, does not meet the *Daubert* criteria. It has not been tested; has not been subjected to peer review and publication; there are no standards controlling it; and there is no showing that it enjoys general acceptance within the scientific community. Further, it was produced solely for this litigation.

-6-

Defendants argue that Zimbalist should at least have used other sports,[4] and possibly other means of entertainment in general, as possible substitutes for attendance at or television viewing of a NEXTEL race. The court agrees with this argument. The record reflects that the admission price to a NEXTEL race is approximately $85.[5] Considering parking and the probable purchase of refreshments, the cost to a family of four would be about $400. Yet, no studies were done to determine whether such a family might patronize a Bengals or Reds game or some other sports event, instead of a NEXTEL race, if that cost were to be raised by $20 (5%).

Rather, Zimbalist has assumed that this race stands alone as a form of entertainment and has formulated his own hybrid[6] test based on this assumption. Where, as here, an expert offers an opinion that is based on a combination of two methodologies, each methodology must meet the *Daubert* criteria, and the combined methodology must meet those criteria also. The remarks of the circuit court in *Elcock v. Kmart Corp.* are pertinent:

> Kmart does not dispute that the Fields and Gamboa approaches are accepted methodologies in the vocational rehabilitation fields; what it does challenge is Copemann's combination method. Each approach, taken in isolation, may very well contain sufficient analytical rigor to be deemed reliable. However, we are inclined to view Copemann's admittedly novel synthesis of the two methodologies as nothing more than a hodgepodge of the Fields and Gamboa approaches, permitting Copemann to offer a subjective judgment about the extent of Elcock's vocational disability in the guise of a reliable expert opinion.

*Elcock,* 233 F.3d 734, 748 (3d Cir. 2000).

---

[4]Prof. Zimbalist considered only the Busch NASCAR race as a possible substitution for a NEXTEL race. Even then, his comparison of the markets for the two races was flawed, as pointed out in Defendants' papers.

[5]Zimbalist report, p. 25.

[6]I.e., partially the Justice Department test and partially his own.

Therefore, the defense motions to exclude Professor Zimbalist's and Professor Leffler's testimony must be granted. It follows that Plaintiff is left without proof of any relevant product or geographic market. Accordingly, its claims based on both sections of the Sherman Act must fail.

### C.   *General Discussion*

#### 1.   **Proof of Relevant Markets Required**

Speedway undertakes to prove relevant market(s) to establish either or both of its Sherman Act claims. (Doc. #272, Pl.'s Mem. in Resp. to Summ. J. 4, n.63.) Therefore, its failure to do so, as set out above, is fatal to both claims. However, Speedway also argues that it has adduced "significant evidence of competitive harm" and, therefore, does not need to prove the relevant markets. *See F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458-61 (1986). In the view of this court, Speedway's evidence is not significant enough to trigger this principle. *Indiana Federation of Dentists* itself involved horizontal restraints and appears to have been limited to such and was so characterized by the Court in *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). Nor is the principle applicable, even if there are some horizontal restraints among ISC and other tracks, where as here the relevant market is not "readily apparent." *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 961 (6th Cir. 2004), *cert. denied,* 546 U.S. 813 (2005). As in *Worldwide Basketball*:

> . . . . Far from being a case in which "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on *customers* and *markets,*" *id.* (emphasis added), *here the relevant market is not readily apparent and the Plaintiffs have failed to adequately define a relevant market, thereby making it impossible to assess the effect of [the challenged NCAA rule] on customers rather than merely on competitors.* While it is true that "the rule of reason can sometimes be applied in the twinkling of an eye," *Bd. of Regents*, 468 U.S. at 109 n. 39, 104 S. Ct. 2948

>(quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37-38 (Federal Judicial Center, June 1981)(parenthetical omitted)), this abbreviated or "quick-look" analysis may only be done *where the contours of the market and, where relevant, submarket, are sufficiently well-known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition.* Under the "quick-look" approach, extensive market and cross-elasticity analysis is not necessarily required, but *where, as here, the precise product market is neither obvious nor undisputed, the failure to account for market alternatives and to analyze the dynamics of consumer choice simply will not suffice.* The district court therefore erred in applying a quick-look analysis.

*Id.* at 961 (emphasis added).

### 2. Vertical Restraints and "Jilted Distributors"

Further, Speedway cannot show an antitrust injury or any actionable anticompetitive behavior. This is because any preference NASCAR shows for favoring ISC tracks is vertical in nature.

The opinion of the court in *Care Heating & Cooling, Inc. v. American Standard, Inc.*, 427 F.3d 1008 (6th Cir. 2005),[7] is directly in point on Speedway's Sherman Act § 1 claims (anticompetitive conspiracy). This is a "classic 'jilted distributor'"[8] case. In the view of this court, Speedway's claims fall squarely within this category.

In *Care Heating & Cooling,* a retail heating and air conditioning company (Care) sued American Standard, d/b/a Trane, because Trane had rejected Care as an approved contractor. *Id.* at 1011. The plaintiff alleged that Trane was conspiring with an approved distributor to prevent

---

[7]Speedway cites *Care Heating & Cooling* in support of its argument that it should not be required to prove the relevant market(s). That case, however, emphasized that such proof is, in fact, required in situations such as this one involving vertical restraints of trade. *See Care Heating & Cooling,* 427 F.3d at 1012-13.

[8]*See Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 810 (6th Cir. 1988).

plaintiff from competing with the approved distributor. *Id.* This scenario is virtually identical with Speedway's claims here.

The district court granted motions to dismiss on the pleadings, and the Sixth Circuit affirmed. *Id.* First, the appellate court held that the "rule of reason must be applied" because a vertical restraint was involved. *Id.* at 1013-14. In language also applicable to the case at bar, the *Care Heating & Cooling* court observed:

> Here, Care complains that Trane's refusal to add it to the list of approved contractors resulted from a continuing agreement between Trane and Buckeye to prevent Care from expanding its business and competing with Buckeye. *Such an agreement, between the manufacturer, Trane, and one of its distributors, Buckeye, satisfies the test for a vertical restraint on trade. The district court correctly noted that this conduct is per se legal*, because a "'manufacturer has a right to select its customers and refuse to sell its goods to anyone, for reasons sufficient to itself.'" *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 243 (6th Cir. 1982)(citations omitted). Trane need not provide justification for its refusal to approve Care. Rather, Care is required to establish the unreasonableness of the alleged trade restraint. *NHL Players' Ass'n*, 325 F.3d at 718.

*Id.* at 1013 (emphasis added).

The *Care Heating & Cooling* court then went on to delineate the elements of a Sherman Act § 1 "rule of reason" claim:

> Rule of reason analysis requires the plaintiff to prove (1) that the defendant(s) contracted, combined, or conspired; (2) that such contract produced adverse anticompetitive effects; (3) *within relevant product and geographic markets*; (4) that the objects of and conduct resulting from the contract were illegal; and (5) that the contract was a proximate cause of plaintiff's injury. *Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989)(citing *Crane v. Shovel Sales Corp.*, 854 F.2d at 805).
>
> . . . . .
>
> Care, however, does not fare as well with respect to the second, fourth, and fifth prongs of the rule of reason test. Regarding the second prong, because the Sherman Act was intended to protect competition and the market as a whole,

-10-

> not individual competitors, *NHL Players' Ass'n*, 325 F.3d at 720 (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338, 110 S. Ct. 1884, 109 L.Ed.2d 333 (1990)), the foundation of an antitrust claim is the alleged adverse effect on the market. Care is unable to establish any adverse effect on the market[9] as a whole. *Although Care alleges that it was unable to secure a contract with Joshua Homes, and that Trane's agreement with Buckeye prevented Care from expanding its business to compete with Buckeye, these results affected Care alone.* Individual injury, without accompanying market-wide injury, does not fall within the protections of the Sherman Act. *See Dunn & Mavis*, 691 F.2d at 243-44 (holding that a complaint which fails to allege facts establishing that defendant's conduct had any significant anticompetitive effect on the market fails to state an antitrust claim). Because Care has not sufficiently alleged adverse effects on the market, Care has failed to satisfy the second prong of the rule of reason analysis.

*Id.* at 1014 (footnote added; emphasis added).

Moreover, the court went on to hold that the fourth prong (illegal object) and the fifth prong (antitrust injury) had not been established.

> The fourth prong requires plaintiff to prove that the objects of and conduct pursuant to the defendants' contract were illegal. *Int'l Logistics Group*, 884 F.2d at 907. The analysis set forth above established and underscored that the Sherman Act has been read narrowly to prohibit only *unreasonable* restraints on trade. *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 98, 104 S. Ct. 2948. Whether the agreement between Trane and Buckeye unreasonably restrains trade must be proved by the pleading of sufficient facts by Care, but Care neglected to prove the existence of such illegality with sufficient facts. As a result, it failed to satisfy the fourth prong of the analysis.

> The fifth and final prong of the rule of reason test requires Care to prove that it suffered an antitrust injury as a result of defendants' contract or conspiracy. In *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 909 (6th Cir. 2003), this court defined an "antitrust injury" as one proximately caused by defendants' allegedly illegal conduct and "of the type the antitrust laws were intended to prevent." Because protecting competition is the *sine qua non* of the antitrust laws, a complaint *alleging only adverse effects suffered by an individual competitor cannot establish an antitrust injury*. *Crane & Shovel Sales Corp.*, 854 F.2d at 807. Care failed to satisfy the fifth prong of the rule of reasons analysis. Therefore, Care failed to state a violation of relevant antitrust law.

---

[9]In the case at bar, no market has been satisfactorily proved.

-11-

*Id.* at 1014-15 (emphasis added).

This court holds that this second quotation exactly fits the situation here.[10] This is a classic case of a vertical restraint situation. That is, NASCAR has chosen certain tracks to be the distributors of its NEXTEL race to the exclusion of others. As noted in *Care Heating & Cooling*, quoted above: An agreement between a producer and a distributor to prevent a competitor of the distributor from expanding its business and competing with the preferred distributor is "*per se* legal, because a manufacturer has a right to select its customers and refuse to sell its goods to anyone, for reasons sufficient to itself." *Id.* at 1013 (*citing Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.,* 691 F.2d 241, 248 (6th Cir. 1982)).

In its recent opinion in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 127 S. Ct. 2705 (2007), holding that resale price maintenance was no longer *per se* illegal, the Supreme Court spoke of the increasingly favorable view of vertical restraints in general. *Accord Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S. Ct. 1884 (1990); *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S. Ct. 2549 (1977).

---

[10]Other Sixth Circuit exclusive dealing cases are: *Ezzo's Inv., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980 (6th Cir.), *cert. denied,* 534 U.S. 993 (2001); *Indeck Energy Serv., Inc. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000), *cert. denied,* 533 U.S. 964 (2001); *Bailey's, Inc. v. Windsor America, Inc.*, 948 F.2d 1018 (6th Cir. 1991); *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802 (6th Cir. 1988); *Beach v. Viking Sewing Mach. Co., Inc.*, 784 F.2d 746 (6th Cir. 1986); and *Sancap Abrasives Corp. v. Swiss Indus. Abrasives*, 19 Fed. Appx. 181 (6th Cir. 2001) (unpublished decision). *See also Philadelphia Fast Foods, Inc. v. Popeyes Famous Fried Chicken, Inc.*, 647 F. Supp. 216 (E.D. Pa. 1986); *Shayne v. Nat'l Hockey League*, 504 F. Supp. 1023 (E.D.N.Y. 1980); and *E.A. Weinel Constr. Co. v. Mueller Co.*, 289 F. Supp. 293 (E.D. Ill. 1968). Speedway relies on *Byars v. Bluff City News Co.,* 609 F.2d 843 (6th Cir. 1979), but that case is not in point since the producer there physically sabotaged plaintiff's operations. 609 F.2d at 854. That case recognizes that vertical refusals to deal are usually proper. *Id.* The law concerning non-actionability of vertical restraints has grown stronger since *Byars. See* text discussion *supra.* Further, the relevant market was clearly defined in *Byars. Id.* at 849.

### *III. CONCLUSION*

Therefore, for the reasons stated herein, **IT IS ORDERED** that:

(1) Defendants' Joint Motion to Exclude the Expert Report and Testimony of Dr. Keith Leffler (Doc. #218) be, and hereby is, **granted;**

(2) Defendants' Joint Motion to Limit the Expert Testimony of Andrew Zimbalist (Doc. #219) be, and hereby is, **granted;**

(3) Defendants' Joint Motion to Strike the Declarations of Keith Leffler and Andrew Zimbalist (Doc. #256) be, and hereby is, **granted;**

(4) For the same reasons previously noted by this Court in addressing Defendant's prior similar request, Defendant ISC's Motion for Summary Judgment on Personal Jurisdiction (Doc. #233) be, and hereby is, **denied;**

(5) Defendants' Joint Motion for Leave to File Supplemental Memorandum (Doc. #281) be, and hereby is, **granted.** Defendants' tendered Supplemental Memorandum is ordered **filed of record;**

(6) The parties' Motions for Leave to file Errata (Docs. #293, #295) be, and hereby are, **granted;**

(7) Defendants' Joint Motion for Summary Judgment on all claims (Doc. #225) and Defendant ISC's Motion for Summary Judgment on Plaintiff's Sherman Act § 2 claim (Doc. #228) be, and hereby are, **granted;**

(8) Defendants' Joint Motion to Exclude Certain Exhibits to Plaintiff's Omnibus Response (Doc. #279) be, and hereby is, **denied as moot;**

(9) For the same reasons noted by the Court in addressing Plaintiff's prior similar requests, Plaintiff's Motion to Unseal the Summary Judgment Record (Doc. #297) be, and hereby is, **denied;**

(10) The Joint Motion to Modify the Final Pretrial Conference Order (Doc. #306) be, and hereby is, **denied as moot**;

(11) The January 23, 2008, Final Pretrial Conference date and March 4, 2008, Trial date, as well as all other case deadlines be, and hereby are, **vacated;** and

(12) This matter is hereby **dismissed with prejudice**. A Judgment shall enter concurrently herewith.

**IT IS SO ORDERED** this 7th day of January, 2008.

Signed By:
*William O. Bertelsman* WOB
United States District Judge